**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**UNITED STATES OF AMERICA,**

**v.**

**DESMOND JAKELL GRIER,**

**Defendant.**

**CRIMINAL ACTION FILE
NO. 1:22-CR-00325-TWT-JEM**

**UNITED STATES MAGISTRATE JUDGE'S
NON-FINAL REPORT AND RECOMMENDATION**

Pending before the Court is Defendant's Motion to Suppress Evidence.
(Doc. 40.) For the following reasons, the Court **RECOMMENDS** that
Defendant's motion, (Doc. 40), be **DENIED**.

## I.   INTRODUCTION

On January 8, 2022, at approximately 6:30 p.m., Atlanta Police Department
Officers Cody Swanger and Keleon Boatley were patrolling the area of
downtown Atlanta, near Edgewood and Jackson Street, in their police cruiser.
(Doc. 68, August 22, 2023 Transcript of Evidentiary Hearing ("Tr."), at 5:8, 6:12-
22, 7:6-7, 16-17, 12:16-13:2.) Swanger was the driver and Boatley was riding in the
front passenger seat; both officers were wearing body cameras ("bodycam" or
"bodycams"). (Tr. at 7:6-7, 16-17, 8:16-17.) Around that time, Defendant drove
past the officers while they were sitting stationary on Edgewood Avenue.
(Swanger's bodycam video, Gov. Ex. 1, at 18:34:42; Tr. at 13:4-5.) Defendant was
driving alone in a white 2001 Lincoln Zephyr registered to Precious Marshall.

(Tr. at 12:2-4, 13:4-5, 19:5-6, 64:7-9.) Swanger pulled behind Defendant and followed him down Edgewood Avenue. (Tr. at 13:4-5, 8-9.)

As the officers were driving directly behind Defendant, Defendant stopped at a red light at the intersection of Edgewood Avenue and Jackson Street. (Tr. at 14:6-7, 29:24-25; Gov. Ex. 1 at 18:34:29.) Both vehicles were stopped at the red light for approximately 25 seconds in the left-turn-only lane. (Tr. at 13:4-5, 33:4-10; Gov. Ex. 1 at 18:35:02 – 18:35:26.) During this time, Swanger saw that Defendant's middle brake light was out and that he was not wearing a seatbelt. (Tr. at 13:6-12.) Swanger explained, "With my training and experience we tend to look at seat belts pretty frequently. It's an easy violation to spot. If you're behind him and you don't see the strap coming down, you kind of get good at looking for that. We didn't see that strap coming down his chest." (Tr. at 13:12-20.) Swanger then observed Defendant turn left onto Jackson Street without using a turn signal. (Tr. at 13:9-10; Gov. Ex. 1 at 18:35:26 – 18:35:35.) The officers followed Defendant, turned on the exterior blue lights of the police vehicle, and initiated a traffic stop. (Tr. at 13:24-14:5, 10-11, 15:16-22; Gov. Ex. 1 at 18:36:00 – 18:36:04.) In his incident report, Boatley wrote that he and Swanger conducted the stop based on the traffic violations of "no seat belt, no breaklights [sic], and failure to use a turn signal." (Gov. Ex. 3.)

After Swanger activated the blue lights, Defendant pulled his vehicle over to the side of Jackson Street. (Tr. at 15:21.) Swanger got out of the patrol cruiser and approached the driver's side door of Defendant's car. (Tr. at 15:24; Gov. Ex. 1 at 18:36:48.) Because the bodycams are placed on the officers' chests, the back of

Defendant's car cannot be seen until the officers get out of their cruiser. (Tr. at 38:2-22.) Swanger testified that, on his approach to the car, he smelled "an odor of marijuana that seemed to be emanating from the vehicle." (Tr. at 17:6-7.) When Swanger was standing at Defendant's driver's side door, Defendant rolled down the window. (Gov. Ex. 1 at 18:36:59 – 18:37:03.) Swanger introduced himself to Defendant and asked if he knew why he had been pulled over. (Gov. Ex. 1 at 18:37:00.) Defendant answered that he did not know, and Swanger explained that Defendant was not wearing his seatbelt and his brake light was out. (Gov. Ex. 1 at 18:37:00 – 18:37:13.) While the bodycam footage shows that Defendant had his seatbelt on when Swanger arrived at the car window, Swanger told Defendant that he saw him put his seatbelt on after the stop. (*Id.*) Swanger asked Defendant for his license, and Defendant told him that he did not have his license with him. (Gov. Ex. 1 at 18:37:11 – 18:37:14.) Based on Defendant's unconfirmed identity and the smell of marijuana, Swanger asked Defendant to step out of the car. (Tr. at 17:13-22.) Defendant told Swanger that he needed to get out of the car through the passenger side door because the driver's door was not operational. (Tr. at 17:23-18:3; Gov. Ex. 1 at 18:37:40.)

As Defendant was getting out of the car, Swanger observed crumbs on Defendant's pants that he suspected were marijuana crumbs "possibly from rolling a marijuana blunt or a joint." (Tr. at 18:18-22.) Swanger testified that he has seen marijuana crumbs "numerous times throughout [his] career." (Tr. at 18:21-22.) Swanger's bodycam footage shows that the officer was standing close to the driver's side door and was using a flashlight to watch Defendant slide over

3

to the passenger seat and get out of the car. (Gov. Ex. 1 at 18:37:56 – 18:38:35.) Once Defendant got out, Boatley, who was standing on the passenger side of Defendant's car, detained Defendant by placing him in handcuffs and escorted him to the back of the patrol car. (Tr. at 19:13-15.)

Swanger began searching the car, starting in the front passenger seat, where a black plastic bag was sitting. (Tr. at 19:20-24.) He looked into the bag and found a Taurus G3 pistol. (Tr. at 19:25-20:14, 45; Gov. Ex. 1 at 18:38:48 – 18:39:08.) He also located a glass jar with suspected marijuana residue near the gear shift in the center console area. (Tr. at 21:8-14; Gov. Ex. 1 at 18:40:30, 18:45:12; Gov. Ex. 3.) Boatley began to assist Swanger with the search. (Tr. at 21:15-16.) Swanger told Boatley, "I think he ate some of the weed . . . you can see there's residue in there," referring to the glass jar. (Gov. Ex. 1 at 18:42:48 – 18:42:54.) The glass jar was collected and placed into evidence. (Gov. Ex. 3.) While waiting in the back seat of the patrol cruiser, Defendant asked Swanger why he was stopped, and Swanger responded, "seatbelt, brake light, turn signal." (Gov. Ex. 1 at 18:46:45 – 18:36:48.) Defendant inquired as to when he turned, and Swanger responded that he had turned off of Edgewood Avenue. (Gov. Ex. 1 at 18:46:53 – 18:46:58.) Both officers then stood outside Defendant's vehicle and briefly discussed the probable cause for the search:

> Boatley:   What was the PC for going in the car?
> Swanger:  Smell of marijuana, and there's that empty thing, but, I mean, did you not smell it as much?
> Boatley:   Not as much. I was more worried about him climbing over.

> Swanger:    Nah, I definitely smelled it and I saw the empty thing . . .
> and it looked like he had flakes on his leg, too.

(Gov. Ex. 1 at 18:49:20 – 18:49:50.) When asked at the hearing whether he smelled burnt or raw marijuana, Swanger testified, "I don't distinguish the two. I reference it as an odor of marijuana. . . . I'm not fond of the smell of marijuana. So it stands out a little bit to me." (Tr. at 43:17-44:2, 49:20-21.) The officers did not photograph or collect the marijuana crumbs that had fallen off Defendant's lap and onto the ground because they were "too small." (Tr. at 18:25-19:1, 48:15-49:13.) Using the patrol cruiser's computer, Swanger confirmed Defendant's identity and his status as a convicted felon. (Gov. Ex. 1 at 18:47:18 – 18:48:57; Gov. Ex. 3.) Defendant was then arrested and taken to Fulton County Jail. (Gov. Ex. 3.) Defendant was later indicted by a grand jury sitting in the Northern District of Georgia on one count of felon in possession of a firearm. (Doc. 1.)

On April 17, 2023, Defendant filed a preliminary motion to suppress the evidence found during the stop and search of the vehicle. (Doc. 40.) On August 22, 2023, this Court held an evidentiary hearing on Defendant's motion. (*See* Doc. 62.) During this hearing, Defendant called two witnesses, Precious Marshall and Brandi Nehls. (Tr. at 60.) During her testimony, Marshall identified herself as Defendant's girlfriend of two years and the owner of the car driven by Defendant on January 8, 2022. (Tr. at 60:17-61:25.) Marshall testified that she picked up her car from impound on January 9, 2022. (Tr. at 62:1-7.) She examined the brake lights that day and found them functioning properly. (Tr. at 62:21-63:2.) She then took the vehicle to a mechanic for examination "to make sure that both of the lights were working." (Tr. at 62:15-18.) The mechanic found that "both" brake

lights were working correctly. (Tr. at 62:19-20.) Also during cross-examination, Marshall initially seemed confused about the third brake light in the back window, though she later said they were "all" on. (Tr. at 64:13-21.)[1] Marshall identified the mechanic as someone named "Dean" whose business is located at the "top of Commercial Avenue," but she did not know the name of the business and did not obtain any paperwork documenting the examination of her vehicle. (Tr. at 65.) Marshall also testified that prior to January 8, 2022, she had never been pulled over or stopped because of her brake lights. (Tr. at 63:6-11.)

Brandi Nehls, a trial unit investigator with the Federal Defender Program, also testified at the hearing. (Tr. at 69:10-70:3.) Nehls testified that on or about August 15, 2023, at 9:30 p.m., she parked her car at the intersection of Williams Holmes Borders Senior and Edgewood and recorded videos of cars driving by perpendicular to her vantage point. (Tr. at 73:21-75:14; Def. Exs. 1-3.) Nehls testified that she could not see whether the drivers of those vehicles were wearing seatbelts, (Tr. at 76:1-3), though she also did not notice whether any of

---

[1] The government and Marshall had the following exchange:

Q:    Did you ask him to look at the middle brake light?
A:    I told him to examine the whole car itself. . . . To check both front and back lights.
Q:    What about the middle light that's in the back window?
A:    In the back window?
Q:    So there's the two taillights and there's a brake light that's in the back window. Did you ask him to check all three?
A:    They were all on. I looked myself.

(Tr. at 64:13-21.)

those vehicles were the same make and model as Defendant's car, (Tr. at 83:24-84:1). Nehls then drove the route the officers took and, while doing so, she specifically looked for whether drivers were wearing their seatbelts, but she could not tell from any angle whether the drivers were wearing their seatbelts. (Tr. at 76:4-16.)

Testimony also was elicited at the hearing about the police cruiser's dashcam. Under APD policy, police officers are required to check that their dashcam is working properly before their shift begins. (Tr. at 51:7-52:17.) Doing so involves checking to see if the dashcam is on, which is indicated by a green light. (Tr. at 58:17-23.) Additionally, the dashcam is supposed to begin recording when the officers turn on their blue lights, (Tr. at 9:11-12), and a red light indicates that the dashcam is recording, (Tr. at 37:19). According to Swanger, "every few months our sergeants do an inspection and then we turn on the blue lights to make sure it [starts recording,] . . . but it is ultimately my responsibility or . . . Boatley's responsibility to make sure it's working." (Tr. at 58:17-59:8.) During the officers' traffic stop of Defendant, the dashcam has a green light, indicating that it is on. (Tr. at 51:3-6.) Swanger, however, "believe[s] that night it did not [start recording]. So it may have been a malfunction." (Tr. at 9:12-13); (*see also* Tr. at 37:22) ("I don't believe at any point it turns red."). Also under APD policy, police officers are required to upload relevant dashcam footage to APD's system by the end of their shift. (Tr. at 53:9-20.) To do so, the officers put the camera on a docking station and "it uploads itself." (Tr. at 53:25-54:10.) Here,

Swanger testified that he checked to see if any dashcam footage had been recorded but that he is not aware of any footage existing. (Tr. at 9:14-18.)

## II.   DISCUSSION

Defendant seeks to suppress the evidence that resulted from the officers' search of his vehicle, arguing that (A) the officers did not have reasonable suspicion to make the traffic stop, and (B) the officers did not have probable cause to search Defendant's vehicle. (Doc. 69 at 7, 13.) The Court will address each argument in turn.

### A.   The officers had reasonable suspicion to make the traffic stop.

The Fourth Amendment of the United States Constitution protects individuals from unreasonable searches and seizures. U.S. Const. amend. IV; *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001). A traffic stop is a seizure within the meaning of the Fourth Amendment. *Prouse*, 440 U.S. at 653; *Purcell*, 236 F.3d at 1277. "A traffic stop . . . 'is constitutional if it is either based on probable cause to believe a traffic violation has occurred or [if it is] justified by reasonable suspicion[.]'" *United States v. Spoerke*, 568 F.3d 1236, 1248 (11th Cir. 2009) (quoting *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008) (per curiam)). Officers may make traffic stops based only on visual observations of traffic violations. *United States v. Monzon-Gomez*, 244 F. App'x 954, 959 (11th Cir. Aug. 2, 2007). Here, Swanger initiated the traffic stop allegedly based on his observation of three traffic violations: Defendant's non-functional middle brake light, Defendant's failure to use his turn signal when making a left-hand turn, and Defendant's failure to wear his seatbelt. (Tr. at 13:4-12.) Because the Court

8

finds that Swanger had reasonable suspicion to initiate the traffic stop based on his observation of Defendant's failure to wear his seatbelt, the Court will address only that violation.

As an initial matter, Georgia law requires "[e]ach occupant of the front seat of a passenger vehicle [], while such passenger vehicle is being operated on a public road, street, or highway of this state, [to] be restrained by a seat safety belt approved under Federal Motor Vehicle Safety Standard 208." O.C.G.A. § 40-8-76.1(b). Thus, failure to wear a seatbelt while driving a car is a violation of that law. *See id.* At the hearing, Swanger testified: "With my training and experience we tend to look at seat belts pretty frequently. It's an easy violation to spot. If you're behind him and you don't see the strap coming down, you kind of get good at looking for that. We didn't see that strap coming down his chest." (Tr. at 13:16-20.) Defendant attempts to discredit Swanger in several ways. First, Defendant argues that Swanger's assertion about this violation is not credible "[g]iven the conditions on the night of the stop[.]" (Doc. 69 at 14.) Other than it being dark, however, Defendant does not explain to what conditions he is referring. (*See id.*) Second, Defendant argues that he was wearing a seatbelt when Swanger approached the car. (*Id.*) But, as captured in Swanger's bodycam footage, Swanger told Defendant at the beginning of the stop that he saw Defendant put his seatbelt on. Third, Defendant argues that, based on Nehls's testimony and videos, "it was impossible to see whether or not a driver was wearing a seatbelt." (*Id.* at 14.) This evidence is unconvincing, and this conclusion is unwarranted. As an initial matter, Nehls is a trial unit investigator

with the Federal Defender Program, not a police officer. While Swanger testified that he is trained on and has frequent experience with looking for seatbelt violations, Nehls gave no such testimony. Additionally, the Court is persuaded by the government's various arguments. To begin, Nehls recorded her videos while sitting at an intersection observing cars driving perpendicular to her vantage point, whereas Swanger saw the seatbelt violation while sitting directly behind Defendant's car at a red light for approximately 25 seconds. (Doc. 72 at 14-15.) Next, Nehls recorded her video in August at 9:30 p.m. but Defendant's stop occurred in January at 6:30 p.m., and the lighting conditions may not have been comparable due to this difference in season and time of night. (*Id.* at 15.) In addition, Nehls admitted to not observing a vehicle that was the same make and model as Defendant's. (*Id.*) Finally, and perhaps most importantly, Swanger's hearing testimony is corroborated by his contemporaneous statements made during the stop. (Doc. 72 at 14.) As documented in his bodycam video, Swanger told Defendant during their first interaction that one of the reasons for the stop was Defendant's failure to wear a seatbelt, which is echoed in the report. (*Id.*) The Court agrees with the government that the evidence from Nehls does not show that it was impossible or even difficult for Swanger to have observed Defendant's seatbelt violation.

Defendant also argues that the officers deliberately failed to upload the dashcam footage of the traffic stop to the case file, and that this Court should thus discredit Swanger's entire testimony. (Doc. 69 at 15.) This Court declines to do so. The Court observed Swanger during the evidentiary hearing and found

his demeanor and testimony credible. In addition, Boatley's bodycam video shows that the light on the patrol car's dashcam video remained on green and never turned red; in other words, the existing evidence shows that the dashcam never began recording. (*See* Gov. Ex. 2 at 18:34:32-18:36:34.) In addition, as discussed above, both officers' bodycam video corroborates Swanger's in-court testimony; that is, the bodycam videos reflect Swanger telling Defendant immediately upon encountering him that Defendant was not wearing a seat belt and that Swanger saw Defendant put on his seatbelt after the stop. The Court concludes that Swanger did not concoct his basis for the traffic stop after the stop.

In sum, Swanger articulated specific facts which lead to a rational inference warranting the stop. He did not see the seatbelt strap coming across Defendant's chest, which he is trained to spot and has experience spotting. This observation lead Swanger to make the rational inference that Defendant was not wearing his seatbelt. Such a violation warrants an investigatory stop. Accordingly, the Court concludes that Swanger had reasonable suspicion to make the traffic stop based on Defendant's seatbelt violation, and that the traffic stop was lawful.

### B.    The officers had probable cause to search Defendant's vehicle.

A warrantless search of an automobile is constitutional if (1) the automobile is readily mobile, and (2) there is probable cause to believe that it contains contraband or evidence of a crime. *United States v. Lanzon*, 639 F.3d 1293, 1299-1300 (11th Cir. 2011). An automobile is readily mobile if it is operational.

11

*United States v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003). Probable cause exists when, under the totality of the circumstances, there is a "fair probability" that contraband or evidence of a crime will be found in the vehicle. *Lanzon*, 639 F.3d at 1300. "[T]he government ultimately has the burden of demonstrating probable cause[.]" *United States v. Terry*, 522 F.3d 645, 650 (6th Cir. 2008). Here, the parties do not dispute that Defendant's car was operational, but they do dispute whether the officers had probable cause to search it. (*See* Docs. 69, 72, 73.) Swanger testified that probable cause existed because he smelled marijuana when approaching the car and because he observed what he believed to be marijuana crumbs on Defendant's lap while Defendant was sitting in the car during the stop. (Tr. at 19:17-19.) Defendant challenges the credibility of Swanger's testimony on both points. (Doc. 69 at 16.)

1.      **Smell of marijuana**

Probable cause may arise when an officer, through training or experience, detects the smell of marijuana. *United States v. Tobin*, 923 F.2d 1506, 1512 (1991) (en banc) ("There is no doubt that the agent's suspicions rose to the level of probable cause when, as the door stood open, he detected what he knew from his law enforcement experience to be the odor of marijuana.") (citing *United States v. Lueck*, 678 F.2d 895, 903 (11th Cir. 1982)). Here, Swanger testified that he smelled marijuana as he approached Defendant's car. Defendant challenges this testimony in several ways. First, Defendant argues that the government did not establish that Swanger's training and experience was sufficient to testify about the odor of marijuana. (Doc. 69 at 17.) He argues that Swanger testified to "some

unspecified 'training and experience,'" and that he has no personal experience with smoking marijuana. (*Id.*) The government responds that Swanger sufficiently testified to his training on, and experience with, marijuana. (Doc. 72 at 19.) The government points to Swanger's testimony that he completed the general 26-week training academy when he started working for the Atlanta Police Department in 2016, that he receives annual training and education, and that he has "sought outside training" on "drug identification and recognition[.]" (Doc. 72 at 19; Tr. at 5:14-16, 6:2-11.) The Court finds this testimony sufficient to show Swanger's ability to testify about detecting the odor of marijuana, and his lack of personal experience smoking marijuana does not lend itself to the opposite conclusion. *See, e.g., United States v. Ludwig*, 508 F.2d 140, 142 (10th Cir. 1974) ("[I]nherent in [an] officer's statement that he smelled marihuana [is that he is] familiar with that substance's odor."); *United States v. Talley*, 692 F. App'x 219, 222 (6th Cir. 2017) (noting that the court was not aware of any case law that required "an officer to attest that he has specialized training in detecting marijuana's [odor] before" his claims that he smelled it were given weight); *United States v. Carr*, 92 F. Supp. 2d 1137, 1141 (D. Kan. 2000) (holding that the officer's affidavit claiming he smelled marijuana emanating from defendant's apartment supported probable cause for a warrant, even though the affiant did not attest to his training or experience with the smell of marijuana).

Second, Defendant argues that Swanger's testimony about smelling marijuana as he approached Defendant's car is "absurd." (Doc. 69 at 17.) He initially points out that the windows of the car were rolled up and that there

were, at most, a few crumbs of marijuana on Defendant's lap while he was sitting in the car. (*Id.* at 17-18.) He argues that Swanger could not possibly have smelled such a small amount of marijuana through Defendant's closed car windows. (*Id.* at 18.) The government does not respond to this point. (*See* Doc. 72.) Nonetheless, the Court is not convinced by this argument, chiefly because it presumes that the odor's source must have been in the vehicle at the time of the stop. *See United States v. Paige*, No. 16-CR-41, 2016 U.S. Dist. LEXIS 91552, at *5 (E.D. Wis. June 23, 2016), *report and recommendation adopted* 2016 U.S. Dist. LEXIS 91544 (July 14, 2016), *aff'd* 870 F.3d 693 (7th Cir., Sept. 1, 2017). But, "[f]or all the [C]ourt knows, a significant quantity of marijuana was in the car shortly before [Defendant was] stopped . . . , and it was the smell from that marijuana that [Swanger] detected." *Id.* (relying on this premise to reject the defendant's argument "that it is not believable that [the police officer] smelled the relatively small amount of marijuana found in a plastic bag located in the console of a car whose doors and windows were closed"). Additionally, Defendant has not presented any evidence to show that it is impossible for someone to smell marijuana through closed car doors and windows. *C.f. United States v. Shumaker*, 21 F.4th 1007, 1013 (8th Cir. 2021) (finding that the district court did not err when crediting an expert's testimony "that a vehicle's windows being up 'would diminish the odors leaving the vehicle,' although [it] is 'still possible to smell . . . if the windows are up . . . but not from a great distance.").

Third, Defendant argues that the officers found no sizable amount of marijuana or evidence of drug paraphernalia during their search. (Doc. 69 at 18.)

The government responds, and the Court agrees, that a lack of marijuana and paraphernalia need not lead to the conclusion that Swanger's testimony about smelling marijuana is incredible. (Doc. 72 at 19-20); *United States v. Salley,* 341 Fed. Appx. 498, 499, 500, 501 n.4 (11th Cir. 2009) (affirming trial court's finding credible the officer's testimony that he smelled the odor of burnt marijuana despite no evidence that the defendant actually possessed or was using marijuana). Additionally, Swanger testified that, during the stop, he assumed Defendant ate the marijuana that had been in the car because of the crumbs he saw on Defendant's pants and because that "has happened in the past." (Tr. at 56:11-18; *see* Tr. at 43:10-13.)

Fourth, Defendant points out that when Swanger asked Boatley during the stop whether he smelled marijuana, Boatley responded, "[n]ot as much[,]" and that the police report – written by Boatley and adopted by Swanger – states: "Upon getting out of the vehicle, an odor of marijuana came from the car[.]" (Doc. 69 at 18; Tr. at 50:5-12.) Defendant argues that these discrepancies show Swanger's testimony is not credible. (Doc. 69 at 18.) But these do not appear to be inconsistent. Plus, as the government points out, despite Boatley's wording in the report, Swanger's bodycam shows that when asked about the probable cause for the stop, he said "smell of marijuana." (Doc. 72 at 21.) Indeed, Swanger states multiple times during the stop that he smelled marijuana, and, at one point, even says, "I think he ate some of the weed." (Gov. Ex. 2 at 18:43:49-53.)

The government further argues, and the Court agrees, that Swanger's testimony is not inherently inconsistent simply because Boatley did not smell the

marijuana as much as Swanger. (*Id.*) As the government points out, Swanger and Boatley are two different people; just because one person smelled an odor and another did not does not require the conclusion that neither person could have possibly smelled it. (*Id.*) Indeed, Swanger approached the vehicle first and on the driver's side, whereas Boatley approached the car later and on the passenger side; because they approached the vehicle at different times and at different places, it is not surprising that they would have different experiences. (*Id.*) (citing *United States v. White*, 593 F.3d 1199, 1201, 1203 (11th Cir. 2010) (finding credible an officer's testimony that he detected the strong odor of marijuana as he and a second officer drove by the defendant's vehicle, although second officer did not smell marijuana and no marijuana was found during subsequent search)).

Fifth, Defendant argues that Swanger refused to specify whether he smelled smoked or raw marijuana, which indicates that Swanger cannot tell the difference between the two, does not remember which one he smelled, or is fabricating the fact that he smelled marijuana at all. (Doc. 69 at 20.) Defendant argues that, either way, Swanger's credibility is in question. (*Id.*) Specifically, according to Defendant, if Swanger cannot tell the difference between the smell of smoked and raw marijuana, then he does not have the appropriate training and experience for his alleged smelling of marijuana to be the basis for probable cause. (*Id.*) If Swanger did not remember whether he smelled smoked or raw marijuana, then his refusal to say so leads to legitimate questions about his forthrightness with the Court. (*Id.*) The government does not respond in any way to this argument. (*See* Doc. 72; Doc. 73 at 7.) The Court is certainly troubled by

Swanger's refusal to testify whether he smelled smoked or raw marijuana, and was frustrated with Swanger's responses on this point. The Court does not find, though, that Swanger's refusal to answer these questions necessarily requires it to conclude that Swanger lied. The Court cannot ignore Swanger's bodycam video, which shows Swanger telling Boatley twice that he believed probable cause existed to search the car because he smelled marijuana, and which is echoed in the report. And, as explained above, despite this frustrating testimony, the Court examined Swanger's testimony as a whole and found him credible. Swanger testified consistently and credibly, he has at least six years of law enforcement experience, and he has been trained on drug identification and recognition.

In sum, the Court concludes that the officers had probable cause to search Defendant's car based on Swanger smelling an odor of marijuana coming from the car.

### 2.   Marijuana crumbs

Defendant also challenges, in several ways, Swanger's testimony that he saw crumbs on Defendant's lap. (Doc. 69 at 21.) The government neither responds to any of these arguments nor argues that Swanger's observation of the crumbs established probable cause. (*See* Doc. 72 at 18-22.) Nevertheless, the Court finds that Swanger's observation of the crumbs did provide probable cause, the Court will discuss each of Defendant's arguments in turn. First, Defendant argues that Swanger's testimony is again inconsistent with the police report, which states that when Defendant exited the car on the passenger side,

there were "marijuana crumbs all over the ground." (Tr. at 50:5-13.) However, this argument is quickly resolved by Swanger's commonsense explanation that "from Boatley's point of view [on the passenger side], . . . those marijuana crumbs fell to the ground." (Tr. at 50:15-19.) Second, Defendant points to Swanger's testimony that the crumbs were so small that they could not be photographed, collected, or taken into evidence. (Doc. 69 at 21-23.) Defendant argues that "one has to question whether they could actually be seen in [Defendant's] lap at night when he [wa]s sitting in a darken[ed] car" and "how the officers determined that the crumbs were marijuana." (*Id.* at 23.) Again, these arguments are quickly resolved by Swanger's bodycam video, which shows that he was standing close to the driver's side door and using a flashlight to look into the car at Defendant and to watch Defendant slide over to the passenger seat to exit the car, and by Swanger's testimony that he has seen marijuana crumbs numerous times throughout his career. Third, Defendant argues that the crumbs cannot serve as probable cause because the officers did not attempt to collect them or field test them to determine that they were marijuana. (Doc. 69 at 21.) However, Defendant does not cite case law to support this argument, nor is the Court aware of any. *C.f. United States v. Peters*, 743 F.3d 1113, 1118 (7th Cir. 2014) ("The deputy's testimony that he smelled burnt marijuana was corroborated, not contradicted, by his statement that he found marijuana particles on [the defendant's] clothing. [Additionally, the defendant] was not charged with marijuana possession and so there was no need for the deputy to collect the few crumbs that he observed on [his] clothing."). Fourth, Defendant argues that

Swanger did not testify about any training he received that would enable him to identify these crumbs as marijuana. (Doc. 69 at 21.) Again, this argument is unconvincing because, as previously discussed, Swanger sufficiently testified to his training on and experience with marijuana identification and recognition. Accordingly, the Court finds that Defendant has not successfully challenged that the officers lacked probable cause to search his car based on Swanger's observation of marijuana crumbs in his lap.[2]

## III.   CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Defendant's Motion to Suppress Evidence, (Doc. 40), be **DENIED**.

**SO RECOMMENDED** January 19, 2024.

_____
J. ELIZABETH McBATH
UNITED STATES MAGISTRATE JUDGE

---

[2] Defendant argues for the first time in his reply brief that the smell of marijuana and the appearance of marijuana crumbs no longer provide probable cause for a search because of the recent proliferation of Delta-8 THC, a legal substance similar to marijuana. (Doc. 73 at 8-10) (citing *Elements Distribution, LLC v. State of Ga.*, 369 Ga. App. 844, 848 (2023), in which the state conceded that Delta-8 THC is not a controlled or illegal substance). Defendant argues that, in states where marijuana is legal, several courts have held that the smell of marijuana alone cannot create probable cause to justify a search. (*Id.* at 9-10) (citing *Commonwealth v. Barr*, 266 A.3d 25 (Pa. 2021); *Juliano v. State*, 260 A.2d 619 (Del. 2021); *Lewis v. State*, 233 A.3d 86 (Md. 2020)). Defendant argues that these cases are analogous to this case because Delta-8 THC is legal in Georgia. (*Id.* at 10.) This argument is creative but unsuccessful. While Delta-8 THC is legal in Georgia, marijuana is not. O.C.G.A. § 16-13-30(j)(1). Therefore, at present, the smell of marijuana alone remains a basis for probable cause in Georgia.